1

2

3

4

5

6

7

8

THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,

                              Plaintiff,

        vs.

OLYMPIA EARLY LEARNING CENTER,
a Washington non-profit corporation; STEVE
OLSON; ROSE HORGDAHL; ALICIA
MENDOZA, individually and as Guardian
Ad Litem for M.M., a minor; G.S.J.,
individually and as Guardian Ad Litem for
J.J., a minor; AMANDA MYRICK,
individually and as Guardian Ad Litem for
S.A., a minor; NICOLE BOND, individually
and as Guardian Ad Litem for A.K., a minor;
NATALIE BOND, individually and as
Guardian Ad Litem for A.K., a minor; LISA
STEEL, individually and as Guardian Ad
Litem for J.E.; LISA STEEL, individually
and as Guardian Ad Litem for J.T.;
DOUGLAS THOMPSON individually;
KRISTI BARBIERI, individually and as
Guardian Ad Litem for S.R.B., G.A.L. DOE,
individually and as Guardian Ad Litem for
N.D., a minor; F.A. DOE, individually; and
M.A. DOE, individually; JOHN DOES 1-8
and JANE DOES 1-8, individually and as
guardians ad litem for J.D. Does, minor
children,

                              Defendants.

NO. 3:12-cv-05759-RBL

DEFENDANTS' MOTION FOR
SUMMARY DISMISSAL OF PLAINTIFF'S
INTERPLEADER ACTION

NOTED: APRIL 19, 2013



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

# I.     RELIEF REQUESTED

Defendants in the above-captioned matter respectfully move the Court to enter summary judgment in their favor and dismiss the interpleader action that Plaintiff Philadelphia Indemnity Insurance Company ("PIIC") has filed.  In the alternative, Defendants respectfully ask the Court to stay the interpleader action pending final resolution of a bad faith lawsuit against PIIC arising out of its failure to defend the insureds.

# II.     INTRODUCTION

Last fall, with only weeks left before trial, the Olympia Early Learning Center ("OELC"), Steve Olson, and Rose Horgdahl (collectively, "Underlying Defendants" or "Insureds") had literally no defense to several claims of negligence that arose out of multiple instances of sexual abuse.  These negligence lawsuits were brought by 13 different plaintiffs (collectively, "Underlying Plaintiffs").  On the eve of trial, after 18 months of litigation, the Underlying Defendants found themselves without any defense because their insurer, PIIC, had egregiously mismanaged the claims and did nothing to ensure that their handpicked counsel developed a viable defense.  Due to PIIC's mismanagement, counsel for the Underlying Defendants never deposed a single plaintiff, expert, or lay witness.  PIIC's mismanagement also resulted in the disastrous situation where the Underlying Defendants were approaching trial without having filed any dispositive motions, motions *in limine*, or any other substantive motions that are otherwise routinely filed to challenge or limit a defendant's liability.  Without any trial preparation, the Underlying Defendants had no choice but to protect their own assets and execute covenant judgments with the Underlying Plaintiffs in each of the three separate lawsuits.

Having acted in bad faith by failing to defend in the underlying lawsuits, PIIC is estopped from seeking a declaratory judgment regarding coverage.  PIIC has also requested to



be discharged of all liability, which is relief that cannot be granted under law, given the nature the insurance contract at issue, the potential for future claims triggering additional policy coverage, and PIIC's role as in interested stakeholder in this interpleader action. Alternatively, this interpleader should be stayed because apportioning an alleged common fund is not ripe where the Underlying Defendants will be seeking monies in excess to the policy limits in state court proceedings.

### III.     STATEMENT OF FACTS

**A.     Defendants Were Liable for the extensive Sexual Abuse That Generated the Underlying Lawsuits.**

At all times relevant, OELC was responsible for children as a professional daycare service provider.[1]  Steven Olson was OELC's executive director, and Rose Horgdahl was its program director.[2]  In 2008, OELC hired 17-year-old Elisha Tabor, the stepson of OELC's former program director, without a reference check.[3] [4]  Over the next several years as an OELC employee, Tabor became the subject of two criminal sex abuse investigations and multiple reports by fellow employees that his sexualized or grooming behavior with students was improper.[5]  Despite these red flags, Tabor continued to work at OELC until 2011, just before he was arrested, charged, and subsequently convicted of raping and molesting children at the daycare.[6]  The 12 claims arising out of the abuse were filed against OELC for negligently supervising this pedophile—a man who admitted during prosecution proceedings that he engaged in bestiality and masturbated into the soiled diapers of children at the day care.  One of the child sexual abuse victims for whom a claim was filed was anally raped, orally raped, orally copulated, masturbated, and molested no less than 50 times.  Tabor's

---

[1] Cochran Decl. at Ex. F.
[2] *Id.*
[3] *Id.* at Ex. B.
[4] *Id.* at Exs. B, F.
[5] *Id.*
[6] *Id.* at Exs. B, F.



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

9ll Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

extensive and prolonged abuse forms the basis of the lawsuits that the Underlying Plaintiffs filed in Thurston County against the Underlying Defendants.[7]

OELC management knew or should have known about Tabor's pedophilia as early as October 2008 when Underlying Plaintiff Lisa Steele raised concerns that "Eli" had inappropriately touched J.T, her minor daughter and OELC student.[8]  OELC returned Tabor to work after a cursory investigation but failed to implement safety measures to increase protection for the children or to increase supervision over Tabor.[9]  OELC also received notice that something was amiss with Tabor on May 20, 2009, just after Underlying Plaintiff Kristi Barbieri notified police and OELC management that her daughter, S.R.B., yelled, "Eli, owie, Mom!" while describing pain in her vagina while in the bathtub.[10]  After another cursory investigation, OELC management again returned Tabor to work and again failed to adopt any measures to increase supervision for Tabor or for the safety of the children.[11]

By the spring and summer of 2010, multiple OELC employees had reported concerns to OELC management about Tabor's inappropriate relationships with the children at the daycare.[12]  OELC failed time and again to take any action to protect children from the danger that Tabor posed.[13]  On February 4, 2011, Olympia Police arrested Tabor on charges of child rape and child molestation.[14]  In May 2011, following investigations of his misconduct during his time as an OELC employee, Tabor pleaded guilty to counts of child rape in the first degree and child molestation in the first degree.[15]

---

[7] *Id.* at Exs. B, F.
[8] *Id.* at Ex. B.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

DEFENDANTS' MOTION FOR SUMMARY
DISMISSAL OF PLAINTIFF'S INTERPLEADER
ACTION
3 of 25 | 3:12-CV-05759-RBL

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

The Underlying Defendants' liability is premised on OELC's complete failure to supervise Tabor, despite several signs of sexual misconduct with minors over the course of his employment.[16]   Several experts have uniformly condemned OELC's poor supervision and failure to protect its daycare children.[17]   OELC ignored glaring red flags and even violated its own rules on staffing ratios and dual classroom supervision, even though such ratios are designed to protect children.   By failing to properly supervise Tabor, OELC enabled him to prey on the young children attending OELC.[18]

**B.       PIIC breached its duty to defend the Underlying Defendants.**

With six child sexual abuse victims, their parents, and a very strong liability claim, the value of the claims in these lawsuits potentially represented millions of dollars, both in terms of settlement value and in terms of potential jury verdicts.[19]   Multi-million dollar verdicts are not uncommon in sexual abuse cases, particularly where a defendant like OELC had actual notice and still failed to protect children, causing significant and substantial abuse.[20]

Notwithstanding the severity of the claims against the insureds, PIIC failed to adequately investigate the claims against the insureds.   The PIIC claims adjuster assigned to the case, Jacqueline Holeman, recently admitted in deposition testimony that her workload while handling the claims against the Insured consisted of 210 claims files, over double what she had handled in previous positions with other insurance companies.[21]   As a result, Holeman did very little to ensure the Insureds had a proper defense.   In fact, with the

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20]
[21] Exhibit 86 at 48: 4-15; 52: 12-25; 53: 1-4.

DEFENDANTS' MOTION FOR SUMMARY
DISMISSAL OF PLAINTIFF'S INTERPLEADER
ACTION
4 of 25 | 3:12-CV-05759-RBL



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

discovery cutoff having passed and with only four weeks left before trial, Holeman admitted that PIIC barely investigated the claims against the Insureds.[22]

Similarly, Holeman also admitted that PIIC never attempted to investigate proof of Tabor's actions:

Q:  Did you ever review the criminal prosecution files on your own to see what the law enforcement agencies had developed in terms of evidence against Eli Tabor?
A:  No.
Q:  Did you contact law enforcement authorities at all to talk with them about what they'd found?
A:  No.
Q:  Did you review the criminal prosecution pleadings to understand what had been developed against Eli Tabor?
A:  No.
Q:  Did you review the conviction judgment and sentence for Eli Tabor at any point?
A:  No.
Q:  Did you personally review the psychosexual evaluation for Eli Tabor, in which he confessed acts of sexual abuse against students at [OELC]?
A:  No.
Q:  Did you attempt to speak with Eli Tabor at any point, personally?
A:  No.
Q:  Did you speak with Rose Horgdal [sic], the site director responsible for supervising Eli Tabor, at any point?
A:  No.
Q:  Did you, yourself, talk with any of the employees who worked with Eli Tabor at any point?
A:  No.
[. . .]
Q:  Did you come to understand at some point that employees who worked with Eli Tabor had expressed concerns about his relationship with one of the children that Tabor was convicted of molesting?
A:  Yes.[23]

In a similar fashion, PIIC never attempted to investigate the severity of Tabor's sexual abuse.  PIIC never reviewed any counseling records of the sex abuse victims; never reviewed

---

[22] Exhibit 85; Exhibit 86 at 83: 15-25; 84: 1-3
[23] *Id.* at 80: 20-25; 81: 1-24; 82: 11.



any testimony by the victims, their parents, or anyone regarding the child sexual abuse; and never obtained expert reports on the damages.[24]  In fact, Holeman's supervisor and PIIC's Assistant Vice President of Claims, Suzanne Pauster, admitted the following:

> Q.  You had mentioned that [PIIC] was looking to discovery to help it evaluate the damages from this point in June of 2011 forward, correct?
> A.  Yes.
> **Q.  *And yet [PIIC] did no discovery as to damages over the next year, did it?***
> **A.  *It appears not.*[25]**

Pauster further admitted that she did nothing to ensure that Holeman obtained or reviewed materials relevant to the merits of the sex abuse claims or the amount of damages involved, including medical records regarding the sex abuse victims, depositions of the victims or their parents, expert reports on whether the victims had been harmed, or expert reports on the insureds' liability.[26]  Pauster also admitted that, other than relying on defense counsel to subpoena records, she did not know what PIIC did to investigate the potential damages claimed against its insureds:

> Q.  Back to my more broad question is, tell us about what investigation [PIIC] did to prepare for the damages claims and the damages evaluation.
> A.  Well, we relied on counsel to subpoena records.
> Q.  Other than relying on the counsel that Philadelphia Insurance Company assigned to the case, what did [PIIC] do?
> A.  I'm not – I don't know.[27]

As of the August 14, 2012, discovery cutoff date, PIIC's investment in its insureds' defense was just as nonexistent as its investigation of the multiple claims of sexual abuse against them.  The defense counsel hired by PIIC submitted his proposed litigation budget in February 2012.[28]  His proposed budget for defending just one of the multiple sex abuse claims

---

[24] *Id.* at 125: 24-25; 126: 1-15.
[25] Exhibit 88 at 5: 14, 19-20; 6: 1-3; 153: 1-9 (emphasis added).
[26] *Id.* at 90: 4-24; 91: 1-11, 16.
[27] *Id.*  at 97: 22-24; 98: 1-8.
[28] Exhibit 86 at 113: 19-22.

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

filed against OELC was $242,000.[29]  Not only did defense counsel's budget contrast greatly from the mere $30,000 expense reserve[30] that PIIC established, PIIC never adjusted the expense reserve until September 4, 2012—weeks after the discovery cutoff in the pending lawsuits.[31]  Similarly, PIIC stopped paying defense counsel in October 2011 and failed to pay him until (again) September 4, 2012.[32]  Holeman admitted that the delays in paying defense counsel resulted from her heavy workload of 210 claims files.[33]  Holeman further admitted that delays in receiving responses from her supervisor also delayed her own work in claims adjusting.[34]

PIIC also admits that it was ultimately responsible for managing defense preparations and for directing defense counsel to "make changes" if the prepared defense was inadequate.[35]  Despite this admission, four weeks before a series of trials against OELC began, none of the abuse victims had been deposed, none of victims' experts had been deposed, and none of the lay witnesses had been deposed.[36, 37]  However, the lack of

---

[29] *Id.* at 113: 23-25; 114: 1-14.
[30] According to Pauster, an expense reserve's purpose is "basically to allow for payment of legal bills."  Exhibit 88 at 136: 19-24.
[31] Exhibit 85; Exhibit 86 at 114: 15-24; Exhibit 88 at 162: 8-12.
[32] Exhibit 86 at 45: 20-23; 115: 15-19; Exhibit 88 at 93: 5-14, 21-23; 166: 21-24; 167: 1-6.
[33] Exhibit 86 at 48: 1-15.
[34] *Id.* at 31: 1-13.
[35] Exhibit 86 at 39: 1-7; 46: 1-8; 77: 12-25; 78: 1-5; 118: 5-25; 122: 2-9, 25; 123: 1-17; Exhibit 88 at 76: 15-21.
[36] Exhibit 85; Exhibit 88 at 64: 9-24; 65: 1-17; 67: 5-12.
[37] When asked about PIIC's failure to take a single deposition, Holeman testified:

| Q: | Between February 28, 2012, and September 5, 2012, did you ever tell [defense counsel] or his law firm that they needed to do more depositions than they had done? |
| A: | No. |
| Q: | Do you know how many depositions he had done on behalf of the Olympia Early Learning Center? |
| A: | No. |
| Q: | Are you aware that he had done no depositions on behalf of the Olympia Early Learning Center? |
| A: | Well, no, I was not aware. |
| Q: | At any point up until September 5 of 2012, did you express concern to [defense counsel] or his law firms about the nature of the defense that they were providing to Olympia Early Learning Center and its directors? |
| A: | No. |



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

depositions or other defense preparations should have come as no surprise to PIIC, given

Holeman's further admissions:

> Q:  Did you expressly talk with [defense counsel] about retaining experts to defend OELC and its directors?
> A:  No.
> Q:  Did you, at any point, review reports from experts that may or may not have been retained on behalf of the Olympia Early Learning Center?
> A:  No.
> Q:  Did you ask to review reports from any experts retained or which may have been retained on their behalf?
> A:  I believe I asked for a summary as a part of the pretrial report.
> Q:  But that was in September of 2012; right?
> [ . . . ]
> A:  Yes. September 5th, 2012.
> [ . . . ]
> Q:  Did you ask that medical examinations be conducted of the child sexual abuse victims at any point during your work as the claims specialist on this case?
> A:  No.
> [ . . . ]
> Q:  Did you have any expert opinions from anyone about the amount of damages that the child sexual abuse victims had suffered in claims against the Olympia Early Learning Center?
> A:  No.
> [ . . . ]
> Q:  You saw no expert reports that were developed on behalf of the Olympia Early Learning Center; correct?
> [ . . . ]
> A:  No.
> Q:  And again, that's because there were no expert reports developed on behalf of the Olympia Early Learning Center; correct?
> A:  I do not know whether reports were generated or not.
> Q:  You've never seen any; correct?
> A:  Correct.

---

> Q:      If you had been aware of concerns, you would have been required to express those to him, correct?
> A:      Yes.
> [ . . . ]
> A:      I did not review any depositions taken on behalf of Olympia Early Learning Center.

Exhibit 86 at 122: 2-25, 123:1-17; 130: 8-9.

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

Q:  And you never voiced concern to [defense counsel] about not having seen
    expert reports; correct?
A:  Correct.
    [ . . . ]
[Q]:Prior to September 5, 2012, why didn't you ask for expert reports
    concerning Olympia Early Learning Center's exposure for these claims?
A:  I do not know. Do not recall.
Q:  Was it because you were too busy with the caseload that you had?
A:  I do not know.[38]

Even Pauster agreed that the lack of depositions conducted on behalf of its insureds

concerned her.[39]  But at the same time, Pauster admitted she did nothing to ensure Holeman

was properly monitoring and directing defense counsel.[40]

In addition to never taking a single deposition, PIIC also failed to ensure or direct

defense counsel to file any substantive or procedural motions to limit the issues and evidence

at trial, and PIIC failed to direct defense counsel to file any.[41]  PIIC's entire approach to

defending the underlying lawsuits was assuming that a defense would be prepared, despite

failing to pay defense counsel or otherwise approve basic litigation activities such as retaining

experts:

Q. Philadelphia Insurance Company is the entity responsible under the contract
   to provide the defense for the Olympia Early Learning Center, correct?
A. Yes.
Q. What did Philadelphia Indemnity Insurance Company do to ensure that a
   proper defense had been provided to the Olympia Early Learning Center?
A. We hired competent counsel.
Q. What else did it do?
A. We assumed that counsel would steer the boat in the right direction.
Q. What else did it do to ensure that its insured, Olympia Early Learning
   Center, had a proper defense?

---

[38] Exhibit 86 at 119:17-25; 120:1-8; 123:24-25; 124:1-2; 126:11-15; 130:10-24; 131:23-25; 132:1-6; Exhibit 88
at 80: 5-10.
[39] Exhibit 88 at 95: 6-9
[40] Exhibit 88 at 69: 24; 70: at 1-5.
[41] Exhibit 86 at 132: 5-13; 134: 24-25; 135:1

DEFENDANTS' MOTION FOR SUMMARY
DISMISSAL OF PLAINTIFF'S INTERPLEADER
ACTION
9 of 25 | 3:12-CV-05759-RBL



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

> A. We interviewed counsel.  We selected the right person for the job with the experience in that area.
> Q. What else did Philadelphia Insurance Company do to ensure that its insured, Olympia Early Learning Center, had a proper defense?
> A. That's what we did.[42]

As a direct result of PIIC's failure to properly manage a defense, the Underlying Defendants were left on the brink of trial without any trial preparedness.  Given the facts of the case and Washington verdicts in similar sex abuse cases, the Underlying Defendants were looking at a distinct possibility of being personally liable for excess judgments.

**C.    PIIC never meaningfully pursued a settlement and failed to timely inform the Insureds of a major coverage dispute.**

Despite the severity of the claims, PIIC never took a meaningful step whatsoever toward resolving the lawsuits on the insureds' behalf short of trial.  Additionally, PIIC never informed the Underlying Defendants about a known insurance coverage dispute.

As early as June 2011, PIIC knew that S.A.'s abuse alone could have resulted in a multimillion dollar verdict that exceeded the insureds' policy limits.[43]  PIIC also knew as early as October 2011 that the Underlying Plaintiffs' position was that OELC had $4 million in coverage—$1 million for each of the 4 years children were injured by Tabor.[44]  But after the Underlying Plaintiffs made a demand for $4 million on December 1, 2011,[45] PIIC responded that coverage limit was only an aggregate of $1 million.  PIIC literally ignored the December demand, making no effort to begin negotiating toward a settlement of the case.[46]  PIIC's position was a clear cause of concern, as defense counsel noted in a letter on February

---

[42] Exhibit 88 at 68: 1-23.
[43] Exhibit 88 at 150: 7-16; 151: 3-13, 18.
[44] Exhibit 90 at 22:11-24; *Id.* at Exs. B, F.
[45] Exhibit 89.
[46] *Id.*

PFAU COCHRAN
VERTETIS AMALA
*A Professional Limited Liability Company*

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

28, 2012: "[The insurance dispute] is an issue that should be worked out sooner rather than later."

Months passed without PIIC doing anything about an obvious coverage conflict. In May 2012, the Underlying Plaintiffs learned that PIIC had hired Soha & Lang as insurance coverage counsel.[47]   By July, however, PIIC had still done nothing to clarify coverage or to mediate the insurance coverage in any way on behalf of its insureds.

Instead, PIIC waited until July 20, 2012—almost 18 months after learning about Tabor's extensive sexual abuse—to finally send letters to the Insureds and notify them for the first time about the ongoing insurance coverage conflict.[48]   In the letter, PIIC acknowledged that is responsible for "providing a defense to OELC and the other defendants under the Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form" which "provides coverage for the negligent supervision claims alleged against OELC, Mr. Olsen [sic], and Ms. Horgdahl for the 'abusive conduct' alleged in the lawsuits," but then argued that its maximum exposure under the four years of policies was limited to the aggregate limit of one policy for a total of $1 million.[49]   PIIC also stated for the first time that the Insureds might want to obtain their own insurance coverage counsel.[50]

Shortly thereafter, on July 30, 2012, PIIC rejected the Underlying Plaintiffs' outstanding $4 million policy limits demand.[51]   In response, the Underlying Plaintiffs sent defense counsel a letter explaining that the Underlying Defendants had every reason to dispute PIIC's "self-profiting interpretation of their policy."[52]   The Underlying Plaintiffs also pointed out that PIIC should have "interplead the money into the court registry long ago rather

---

[47] Exhibit 86 at 148: 22-25; 149: 1; 156: 23-25; 157: 1-5; Exhibit 88 at 13-17.
[48] Exhibit 86 at 140: 24-25; 141: 1-17; Exhibit 88 at 151: 19-24; 152: 1-6, 11-13, 21-24.
[49] Id.
[50] Id. at 137: 5-20.
[51] Id.
[52] Id.

DEFENDANTS' MOTION FOR SUMMARY
DISMISSAL OF PLAINTIFF'S INTERPLEADER
ACTION
11 of 25 | 3:12-CV-05759-RBL

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

than force the defendants into jury trial with a late disclosure of its policy position."[53]  Weeks later, PIIC communicated with defense counsel about its planned filing of the present interpleader action.[54] [55]  [56]  [57]

On August 27, PIIC filed this interpleader action knowing that the Underlying Defendants were on the verge of assigning bad faith claims to the Underlying Plaintiffs in exchange for covenant judgments.  Realizing its bad faith exposure, PIIC has requested the following specific relief in an attempt to avoid any liability greater than $1 million by requesting the Court to:

> 5.1    Determine the maximum insurance policy limit to which all claimants could be entitled under the Policies reserving the remainder to Philadelphia Indemnity

> 5.2    Discharge Philadelphia Indemnity from all liability in connection with this litigation and the Policies;

> 5.3    Declare that upon payment of the applicable policy limits as determined by the Court as 'damages,' as defined by the policy, and after complying with all other policy terms and conditions, Philadelphia Indemnity will have no further duty to defend or indemnify Olympia, Mr. Olson, or Ms. Horgdahl with regard to the claims of Underlying Plaintiffs, N.D. and Does 1-10.[58]

Once PIIC learned that this Court was assigned to the case, PIIC noted with apparent relief that the "Judge on the interpleader is defense oriented."[59]  In fact, in a recent deposition,

---

[53] *Id.*

[54] Despite its retention of coverage counsel in May 2012 and subsequently filing suit against its insureds, PIIC did not separate its claims file from its coverage file in the underlying litigation until September 5, 2012. Holeman has admitted that she did not know why PIIC had coverage counsel consulting with Bolasina about the interpleader, an action against defense counsel's own clients and PIIC's insureds. Even after the file separation, a September 19 meeting was set between coverage counsel and Bolasina. Holeman was aware of the meeting but did not advise either counsel that it should not take place because of the file separation. Exhibit 86: at 168: 23-25; 169: 1-25; 170: 1-16; *Id.* at 172: 20-25; 173: 1.

[55] Holeman at 179: 16-24; 180: 15-25; 181: 1-3.

[56] Holeman at 159: 1-10.

[57] *Id.* at 160: 10-13.

[58] Dkt. #1.

[59] Exhibit 86 at 165: 16-23; Exhibit



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

PIIC admitted that this Court's alleged "defense orient[ation]" was a factor that PIIC considered in evaluating "the potential at trial or in decisions on the motions."[60]

**D.      Defendants confess to judgment and agree to settle the lawsuits.**

Without any meaningful trial preparedness or settlement negotiations undertaken on their behalf, PIIC left its Insureds with no other choice but to enter into covenant judgments with the 13 Underlying Plaintiffs to avoid the certainty of being personally liable for substantial excess verdicts.[61]  Because of the nature of the allegations, the strength of the Underlying Plaintiffs' case, the complete absence of a defense, and the other risks of litigation existing at the time, the Insureds agreed to covenant judgments totaling $24,500,000 and an assignment of any bad faith claims they might have against PIIC to the Underlying Plaintiffs.[62]  In exchange the Insureds received protection from the certain excess liability.[63]

After executing these covenant judgments, the Underlying Plaintiffs began the process of holding a reasonableness hearing in Thurston County Superior Court under RCW 4.22.060.[64]  The state court proceedings are ongoing and are the first step to a bad faith lawsuit in a covenant judgment situation.  *See*, *generally*, *Bird v. Best Plumbing Group, LLC*, 175 Wn.2d 756, 287 P.3d 551 (2012).

---

[60] *Id.* at 166: 15-20.
[61] Dkt. #18.
[62] *Id.*
[63] *Id.*
[64] *Id.*

PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

### IV.      STATEMENT OF ISSUES

1.   Should PIIC be equitably estopped from pursuing this interpleader because of its bad faith and unclean hands in the underlying state court lawsuit?

2.   Should PIIC's interpleader be dismissed where it has requested relief that cannot be granted?

3.   In the alternative, should PIIC's interpleader be stayed pending the outcome of the state court proceedings?

### V.      EVIDENCE RELIED UPON

This motion relies upon the Declaration of Darrell L. Cochran In Support of Defendants' Motion for Summary Judgment Regarding the Bad Faith Estoppel of Plaintiff's Interpleader Action, the Declaration of Paul Dolbow In Support of Defendants' Motion for Summary Judgment. as well as all of the pleadings, exhibits, documents, and orders already on file in this matter.

### VI.      LEGAL ARGUMENT

**A.      Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions and provides that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). The moving party bears the burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A mere scintilla of evidence for the nonmovant's claim is not sufficient to



9ll Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995). Instead, the party opposing summary judgment must come forward with significant probative evidence. *Anderson*, 477 U.S. at 249-50. The party opposing summary judgment may not rest on conclusory allegations or mere assertions. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989); *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir.1988); *Berg v. Kincheloe*, 794 F.2d 457 (9th Cir.1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

**B.     PIIC Is Estopped From Asserting a Coverage Defense In This Equitable Proceeding, and, Therefore, PIIC's Liability Cannot Be Limited to Policy Amounts.**

Interpleader actions were developed in equity and are governed by equitable principles. *Lee v. West Coast Life Ins. Co.*, 688 F.3d 1004, 1012 (9th Cir. 2012). In federal courts, interpleader actions normally involve two steps: first, a determination that the interpleader suit is proper; and second, a trial on the merits between the various claimants. *NYLife Distribs., Inc. v. Adherence Group, Inc.*, 72 F.3d 371, 375 (3rd Cir. 1995). The "first stage" of an interpleader, namely, determining whether interpleader is appropriate, is a question for the Court. *See* 7 WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE, § 1714 at 581–584 (interpleader actions generally proceed in two stages: during the first, the Court determines whether interpleader is appropriate and discharges the stake holder; in the second, the rights of the claimants are adjudicated). The first stage of interpleader is equitable and therefore, this Court has discretion to deny equitable relief to persons such as PIIC where they have unclean hands. 44B AM. JUR. 2D INTERPLEADER § 7 (footnotes omitted). "'The doctrine [of unclean hands] bars relief to a plaintiff who has violated conscience, good faith, or other



equitable principles in his prior conduct.'" *Seller Agency Council, Inc. v. Kennedy Ctr. For Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir. 2010) (alteration in original) (quoting *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989)).

Those who have acted in bad faith to create a controversy over the stake may not claim protection in an interpleader action. *Lee*, 688 F.3d at 1012; *Farmers Irrigating Ditch & Reservoir Co. v. Kane*, 845 F.2d 229, 232 (10th Cir. 1988) ("It is the general rule that a party seeking interpleader must be free from blame in causing the controversy, and where he stands as a wrongdoer with respect to . . . any of the claimants, he cannot have relief by interpleader."). For example, an administrator of Internet domain names cannot interplead a disputed domain name when the administrator is also a defendant to a breach of contract claim alleging that the administrator breached its contract with one of the competing claimants to the domain name. *Network Solutions, Inc. v. Clue Computing, Inc.*, 946 F. Supp. 858, 861 (D. Colo. 1996). In such a case, the interpleading party is part of the larger dispute, not a mere innocent stakeholder.

Likewise, here PIIC's control over the Insureds' defense without reservation for over a year, bad faith and unclean hands in handling the defense, and subsequent abandonment of the insureds under the pretext of a coverage dispute estops PIIC from simply filing an interpleader and then asking the Court to discharge its liability.

1.  <u>Having controlled the Insureds' defense for 18 months without reserving its rights, PIIC is estopped from disputing coverage as a matter of law</u>

In *Transamerica Ins. Group v. Chubb & Son, Inc.*, 16 Wn. App. 247, 248-49, 251-52, 554 P.2d 1080 (1976), *review denied*, 88 Wn.2d 1015 (1977), an insurer who accepted defense of its insureds without reservation and controlled the defense for 10 months, but subsequently disputed coverage, acted in bad faith, and presumptively prejudiced its insureds, thereby being estopped from later disputing coverage. *See also Safeco Ins. Co. of Am. v.*



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company
911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799 Facsimile: (253) 627-0654
www.pcvalaw.com

*Butler*, 118 Wn.2d 383, 393, 406, 823 P.2d 499 (1992) ("In *Transamerica* . . . the court held the insurer's bad faith acts estopped it from denying coverage."). The insurer's unreserved assumption of the defense for 10 months presumptively prejudiced its insureds for three reasons. *Transamerica*, 16 Wn. App. at 251-52.

**First**, in assuming control of its insureds' defense, the insurer deprived its insureds of selecting investigators and attorneys of their own choosing. *Transamerica*, 16 Wn. App. at 251; *see also City of Carter Lake v. Aetna Cas. And Sur. Co.*, 604 F.2d 1052, 1061-1062 (8th Cir. 1979) (insurer who assumed defense without reservation of rights of all claims against insured but denied coverage as to some claims two months before trial deprived insured of opportunity to conduct "full and timely" pretrial discovery was estopped from denying coverage); *Pac. Indem. Co. v. Acel Delivery Serv., Inc.*, 485 F.2d 1169, 1175-1176 (5th Cir. 1973) (fact that insurer assumed defense without reserving rights but later denied coverage deprived insured of "opportunity to investigate the facts while in close proximity to their occurrence" and timely pretrial discovery supported estoppel of coverage defense). **Second**, "control of the defense is vitally connected with the obligation to pay"; as the court observed, it would be unimaginable that the insurer would allow the insured to control the defense for 10 months and still pay any resulting judgment. *Transamerica*, 16 Wn. App. at 251. **Third**, there existed the possibility of a conflict of interest; during the 10 months that the insurer controlled its insureds' defense, the insurer could also prepare a coverage defense for itself. *Id.* at 251-52; *accord Carter Lake*, 604 F.2d at 1062; *Pac. Indem. Co.*, 485 F.2d at 1176. The court observed that, "[a]s a matter of law and in the absence of extraordinary circumstances, 10 months is too long a period" for the insurer to occupy the "dual role" of protector of and potential adversary to its insureds' interests. *Transamerica*, 16 Wn. App. at 252.

*Transamerica* aptly summarized why the insurer was estopped from denying coverage as follows:  "The course cannot be rerun, no amount of evidence will prove what might have



occurred if a different route had been taken.  By its own actions, [the insurer] irrevocably fixed the course of events concerning the law suit for the first 10 months.  Of necessity, this establishes prejudice [to its insureds]."  *Id.* at 252; *accord Collins v. Grange Mut. Cas. Co.*, 124 Ohio.App.3d 574, 579, 706 N.E.2d 856 (1997) (insurer who controlled insureds' defense for over sixteen months and later disputed coverage necessarily prejudiced insureds and was estopped from denying indemnification of settlement).

Like in *Transamerica*, here PIIC assumed responsibility for and control of the Insureds' defense without reservation for a year and a half.  Especially in light of PIIC's complete failure to prepare a defense for the Insureds, as discussed below, this Court should not allow PIIC to expose the Insureds to the financial consequences of its actions.  Additionally, even though the *Transamerica* court found the mere possibility of a conflict of interest justified estoppel, the facts here demonstrate much more.  From the very beginning, the Underlying Plaintiffs have taken the position that the Insureds' coverage was $4 million.  While knowingly disputing the coverage, PIIC failed to build a defense for the Insureds and then exacerbated the problem by failing to negotiate their claims.  If this was not enough to prejudice its Insureds, PIIC waited until only one month before the discovery cutoff to reveal an ongoing dispute and potential for excess verdicts.[65]   Part of PIIC's strategy in this delay was allowing it to time to coordinate this interpleader as a red herring to minimize its own financial liability under the pretense of a coverage dispute.

---

[65] As the *Pacific Indemnity* court observed, these facts alone justify estoppel of a late-raised coverage defense:
   "[W]e hold that because [the insurer] had knowledge of facts to indicate the possible lack of coverage, but through its own lack of diligence failed to make further inquiry to verify these doubts either for or against coverage, such a factual basis is sufficient to support an estoppel. [The insurer] cannot be allowed to benefit from its own inattentiveness and failure to more fully ascertain the facts over a one and a half year period."
485 F.2d at 1175.



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

In sum, like the insurer in *Transamerica*, PIIC "irrevocably fixed the course of events" in the underlying litigation for over a year, spending part of that time more concerned with its interests than those of the insureds. PIIC's subsequent abandonment of the insureds to pursue this coverage action constituted bad faith and presumptively prejudiced the insureds. *Butler*, 118 Wn.2d at 393, 406; *Transamerica*, 16 Wn. App. at 251-52. This presumption of prejudice cannot be rebutted through the fact that the insureds assigned their bad faith claims to the underlying plaintiffs in an exchange for a covenant not to execute a judgment against them. *Butler*, 118 Wn.2d at 397-400. Accordingly, having fixed the litigation's course, the Court should order PIIC to stay the course by estopping it from disputing coverage and denying its requested relief.

2.   PIIC's bad faith and unclean hands in handling the insureds' claims estops it from subsequently contesting coverage

Even if this court finds that *Transamerica* does not control in this case, PIIC's bad faith and unclean hands in handling the insureds' claims estops it from now contesting coverage under the policies. Washington law imposes on insurers a "'broad obligation of fair dealing'" and "a responsibility to give 'equal consideration' to the insured's interests." *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 385-86, 715 P.2d 1133 (1986) (quoting *Tyler v. Grange Ins. Ass'n*, 3 Wn. App. 167, 173, 177, 473 P.2d 193 (1970)). An "insurer's duty of good faith is separate from its duty to indemnify if coverage exists." *Coventry Assocs. v. Am. States Ins Co.*, 136 Wn.2d 269, 279, 961 P.2d 933 (1998). Moreover, an insurer can breach this duty through "conduct that does not amount to intentional bad faith or fraud." *Indus. Indem. Co. of the Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 916-17, 792 P.2d 520 (1990).

Recognizing the incentive for insurers to handle claims in bad faith while retaining the right to dispute coverage, Washington law imposes on an insurer "an enhanced obligation of fairness towards its insured." *Tank*, 105 Wn.2d at 383. An insurer meets this enhanced duty



when it (1) "thoroughly investigate[s]" the claim against the insured, (2) "retain[s] competent defense counsel for the insured," (3) fully informs the insured of "all developments relevant to his policy coverage and the progress of the lawsuit," and (4) "refrain[s] from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk." *Id.* at 388. An insurer's breach of its duty of good faith to its insured estops it from denying coverage. *Butler*, 118 Wn.2d at 394, 406.

Here, PIIC failed to meet any of its *Tank* obligations as a matter of law; reasonable minds cannot differ. **First**, PIIC clearly failed to meet its *Tank* obligation to thoroughly investigate the claims against its insureds. It took virtually no proactive measures in the insureds' case. When PIIC did act, its own investigation consisted of merely contacting Olson, reviewing Tabor's personnel file, and searching for online news articles. Such handling cannot and does not meet PIICs's first *Tank* obligation in a case involving six child sex abuse victims who suffered extensive and prolonged abuse.[66]

**Second**, PIIC failed to meet its *Tank* obligation to provide a competent defense for its insureds. Despite having knowledge that defense counsel's proposed litigation budget for only *one* of the underlying cases exceeded PIIC's *entire* expense reserve, PIIC chose not to increase the reserve until after the discovery cutoff. In the meantime, PIIC failed to direct defense counsel for the insured to depose any of the victims, their expert witnesses, or their lay witnesses. Likewise, PIIC failed to direct defense counsel to obtain any expert witnesses, to conduct any medical examinations of the child sex abuse victims, or to file any substantive or procedural motions in support of the insureds' case. Finally, PIIC failed to pay defense counsel for whatever work was performed for an entire year. In short, PIIC provided an

---

[66] Dolbow Decl. at 4, 7.



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

underfunded, unguided, and unpaid defense—certainly not an adequate or competent defense under *Tank*.[67]

**Third**, PIIC failed to meet its *Tank* obligation to fully inform the insureds of developments relevant to their policy coverage.[68]  The Underlying Plaintiffs' September 2011 request for four years' worth of the insureds' policies, the Underlying Plaintiffs' October 2011 deposition questions to Olson about four years' worth of coverage, and the Underlying Plaintiffs' December 2011 policy limit demands and warning of potential excess verdicts unquestionably notified PIIC of the Underlying Plaintiffs' policy limits interpretation. Further, at the very latest, the May 18, 2012 communications between the underlying parties notified PIIC of the Underlying Plaintiffs' policy limits interpretation.  PIIC, however, failed to inform the insureds of their potential excess liability until July 20, 2012, two months before trial was set to begin and one month until the discovery cutoff.  In the face of PIIC's inaction, the insureds rationally chose to settle with the Underlying Plaintiffs rather than risk untold millions in liability by proceeding to trial without a defense.

**Finally**, PIIC failed to meet its *Tank* obligation to refrain from acts demonstrating greater concern for its own interests than its insureds.[69]  At the latest, it became clear counsel for the plaintiffs in the underlying sex abuse case and PIIC interpreted the policy limits differently in May 2012.  PIIC, however, failed to separate the insureds' claims file and its own coverage file until September 5.  Further, even after May 2012, PIIC and its coverage counsel continued to coordinate its efforts in its interpleader action with defense counsel— who was retained in theory to provide a defense for the insureds and who, in reality, was left unpaid and unguided in doing so.  The notation in the insureds' ***claims file*** that "Judge in the

---

[67] Dolbow Decl. at 5, 7.
[68] Dolbow Decl. at 5, 7.
[69] Dolbow Decl. at 6-7.



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

interpleader action is defense oriented" perfectly punctuates this theme: in the months approaching trial, PIIC's time and resources were focused on minimizing its liability through a favorable interpretation of the Insureds' policy, regardless of the prejudice to the insureds.

In sum, PIIC's duty of good faith in handling the insureds' claims included several obligations under *Tank*.  PIIC breached every single one of them.  As a matter of law, each of PIIC's breaches, whether inadvertent or intentional, constituted bad faith, and presumptively prejudiced the Insureds.  *See Butler*, 118 Wn.2d at 391; *Kallevig*, 114 Wn.2d at 916-17.  In the face of PIIC's bad faith and unclean hands, this court should not allow it to seek equitable relief from its actions under cover of this eleventh-hour coverage "dispute."  Instead, this court should find that PIIC's inequitable conduct estops it from disputing coverage under the insureds' policies and deny its motion for summary judgment.

## C. PIIC's Interpleader Should Be Dismissed Because It Has Requested Relief That Cannot Be Granted

An interpleader is conditioned on the pledge of property sufficient to cover all damages for which the interpleading party may be liable, and an order of discharge is necessarily limited to distributing what is correspondingly interpleaded.  PIIC has not pledged property sufficient to cover its potential liability in this case or its future liability for acts involving individuals unrelated to the underlying cases at issue here.  Therefore PIIC cannot be discharged "from all liability in connection with this litigation and the Policies."  Plaintiffs' Complaint at ¶ 5.2.  Such relief would improperly preclude claims for damages for bad faith, as well as precluding claims by other children with claims of abuse by other OELC employees not connected to Elisha Tabor.

The pledge of property, such as insurance proceeds, does not wipe out the claims of persons asserting rights against the insurer.  *New York Life Ins. Co. v. Lee*, 232 F.2d 811, 814



(9th Cir. 1956). In *Lee*, the insurer deposited the proceeds of a policy, but it was also potential liable for attorney's fees and interest. *Id*. The Ninth Circuit affirmed the dismissal of the interpleader action because the interpleading party had not deposited any amount to cover such damages and observed that interpleader was not intended to destroy rights acquired under state law. *Id*. at 812, 814. *See also State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 1199, 1205 (1967) (order of discharge appropriate only where fund itself marks the outer limits of the controversy).

**D.      The Court Should Stay The Current Proceedings Pending Resolution of Defendants' Pending Bad Faith Action Against Philadelphia Indemnity**

Even if PIIC is not estopped as a matter of law from asserting its coverage defenses, a stay should be entered because the Underlying Plaintiffs' pending state court bad faith action against PIIC will render any policy limits determination unnecessary.  Under this state's law, an "insurer's duty of good faith is separate from its duty to indemnify if coverage exists." *Coventry Assocs. v. Am. States Ins Co.*, 136 Wn.2d 269, 279, 961 P.2d 933 (1998). Accordingly, Washington has adopted the "no limit" test in determining whether an insurer has given its interests and its insureds' interests equal consideration while handling the claim. *Tyler*, 3 Wn. App. at 178; *Hamilton v. State Farm Ins. Co.*, 83 Wn.2d 787, 794, 523 P.2d 193 (1974) (approving "no limit" rule and "no limit jury instruction" stating, "[T]he law requires that [an attorney employed by an insurance company to represent its insured] conduct himself . . . as if the insurance policy has no limits.").  Under the "no limit" test, the insurer must consider the total risk in deciding whether or not to accept a settlement offer, regardless of whom is bearing what portion of that risk.  *Tyler*, 3 Wn. App. at 178.

The Underlying Plaintiffs anticipate that PIIC will argue that this court's determination of whether it correctly interpreted the insureds' policy limit as $1 million is



relevant to whether it made good faith efforts to defend its insureds and settle the claims against them.  Such a determination is irrelevant to the bad faith question, however.  Under the Washington "no limit" rule, PIIC essentially had to act as if there were no limits to the insureds' policy while providing their defense.  *See Tyler*, 3 Wn. App. at 178; *Hamilton*, 83 Wn.2d at 794.  Moreover, PIIC had to consider the total financial risk, including the risk to the insureds, in pursuing settlement of the underlying sex abuse claims.  *See Tyler*, 3 Wn. App. at 178.  Regardless of what PIIC believed was the policy limit, it was entirely incapable of considering the total financial risk to the insureds because of its complete failure to evaluate that risk through investigating the victims' claims and developing a defense.

The Underlying Plaintiffs will likely succeed in a pending bad faith action against PIIC given the textbook nature of PIIC's bad faith.  By proving bad faith in the state court proceedings, PIIC would be estopped PIIC from asserting coverage defenses, including its anti-stacking interpretation of insureds' policy, thus rendering the Court's interpretation of the policy unnecessary.  *See Butler*, 118 Wn.2d at 394, 406.  Therefore, given the likelihood of a finding of bad faith and in the interests of judicial economy, this court should stay the proceedings before it until resolution the Underlying Plaintiffs' pending bad faith action against PIIC.

## VII.    CONCLUSION

For the foregoing reasons, Defendants respectfully ask that the Court dismiss PIIC's complaint.  In the alternative, Defendants respectfully ask that the Court stay all proceedings until the state court proceedings have been fully resolved.

// //

// //

DEFENDANTS' MOTION FOR SUMMARY
DISMISSAL OF PLAINTIFF'S INTERPLEADER
ACTION
24 of 25 | 3:12-CV-05759-RBL



911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com

1

2    Dated this 28th day of March, 2013.

3

4                                PFAU COCHRAN VERTETIS AMALA, PLLC

5

6

7    By _____

8       Darrell L. Cochran, WSBA No. 22851
        darrell@pcvalaw.com
9       Loren A. Cochran, WSBA No 32773
        loren@pcvalaw.com
10      Kevin M. Hastings, WSBA No 42316
        kevin@pcvalaw.com
11      Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' MOTION FOR SUMMARY
DISMISSAL OF PLAINTIFF'S INTERPLEADER
ACTION
25 of 25 | 3:12-CV-05759-RBL



1

2

3

## CERTIFICATE OF SERVICE

4

    I, **Ami Erpenbach**, hereby declare under penalty of perjury under the laws of the

5

State of Washington that I am employed at Pfau Cochran Vertetis Amala PLLC and that on

6

today's date, I served the foregoing via Legal Messenger / **E-Service** / U.S. Regular Mail /

7

Facsimile by directing delivery to the following individuals:

8

9

10

    Steven Soha

11

    Michael O'Clair
    Paul M. Rosner

12

    Donna M. Chamberlin
    Soha & Lang, P.S.

13

    1325 Fourth Avenue
    Ste. 2000

14

    Seattle, WA  98101-2570
    Attorneys for: Philadelphia Indemnity Indemnity Insurance

15

16

    DATED this 28th day of March, 2013.

17

18

19

20

    Ami Erpenbach

21

    Legal Assistant to Darrell L. Cochran

22

23

24

4843-7050-9075, v.  1

25

26

DEFENDANTS' MOTION FOR SUMMARY
DISMISSAL OF PLAINTIFF'S INTERPLEADER
ACTION
13:12-CV-05759-RBL



PFAU COCHRAN
VERTETIS AMALA
A Professional Limited Liability Company

911 Pacific Avenue, Suite 200
Tacoma, WA 98402
Phone: (253) 777-0799  Facsimile: (253) 627-0654
www.pcvalaw.com