HONORABLE RONALD B. LEIGHTON

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,

CASE NO. C12-5759 RBL

11

                         Plaintiff,

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT ON
POLICY LIMITS

12

            v.

13

OLYMPIA EARLY LEARNING
CENTER, et al.,

[DKT. #64]

14
15

                         Defendants.

16
17
18

        THIS MATTER is before the Court on Plaintiff PIIC's Motion for Summary Judgment

19

regarding the limits of coverage.  [Dkt # 64]  The case involves multiple claims of sexual abuse

20

by Eli Tabor, an Olympia Early Learning Center[1] employee.  The abuse occurred over several

21

years.

22

        PIIC insured OELC under a series of annual policies that included coverage for sexual

23

abuse, subject to a variety of conditions unique to the Sexual Abuse Rider.  PIIC seeks a

24

declaratory judgment that the policies provide only and exactly $1 million in coverage, despite

25

_____

26
27

        [1] The underlying victim plaintiffs settled with OELC and obtained an assignment of
OELC's rights against its insurer, PIIC.  In this Declaratory Judgment Action, the underlying
plaintiffs stand in OELC's shoes.  They are referenced as OELC for clarity.

28

the fact that there were multiple victims and that the abuse occurred in each of the four[2] policy periods.

On the merits[3] of the coverage dispute, OELC argues that PIIC's interpretation of the admittedly unusual sexual abuse rider is inconsistent with the policy, and with the manner in which a lay person would read the policy. The policy language and the parties' respective interpretations of it are discussed below.

## I.    THE INSURANCE POLICIES.

PIIC insured OELC under four annual policies from September 26, 2007 to September 26, 2011. For purposes of this case and this Motion, the policies appear to be identical. Each contained a "Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form," or Sexual Abuse Rider.

Several of the Riders' provisions are at issue in this Motion. PIIC argues (and seeks a judgment declaring) that it is liable for $1 million—the limit described in the Declarations—regardless of the number of victims or acts or the number of policy periods in which abuse occurred. OELC argues that each Rider's $1 million limit can be stacked where, as here, bodily injury occurred in each of the policy periods.

The Rider insured OELC against damages it was obligated to pay for bodily injury arising from abusive conduct by an employee:

---

[2] PIIC also argues that there is no evidence that any abuse occurred prior to February 2009, and that its first policy (September 2007 - September 2008) was not triggered in any event. [*See* Dkt. # 64 at fn. 5]  OELC apparently claims that each policy was triggered.

[3] OELC also argues that because PIIC engaged in bad faith, its claim for declaratory relief (and the policy interpretation issue presented in this motion) is moot.

**SECTION I - COVERAGE**
**SEXUAL OR PHYSICAL ABUSE OR MOLESTATION**
**VICARIOUS LIABILITY**

1.  **Insuring Agreement**

    a.  We will pay those sums that the insured is
        legally obligated to pay as "damages"
        because of "bodily injury" to which this
        insurance applies, if the insured is alleged
        to be liable for another person's "abusive
        conduct", by reason of :

        (1) the negligent:
            (a) employment;
            (b) selection;
            (c) investigation;
            (d) supervision;
            (e) reporting to the proper authorities, or
                failure to so report; or
            (f) retention; of any "employee", volunteer or
            any other person or persons for whom the
            insured is or ever was legally responsible; or

        (2) the negligent:
            (a) design;
            (b) control;
            (c) maintenance; period.

(d) supervision;
(e) inspection; or
(f) investigation of prospective tenants;

of your premises, premises in your control or premises you have leased to another;

or

(3) the negligent failure to provide professional

services or neglect of the therapeutic needs of a client, patient or other person because of the "abusive conduct".

Subject to the above provisions, we have the right and duty to defend any "suit" seeking "damages" because of another person's "abusive conduct". However, we have no duty to defend the insured against any "suit" seeking "damages" to which this insurance does not apply. We may at our discretion, investigate any "abusive conduct" and settle any claim or "suit" that may result. But

(a)  The amount we will pay for "damages" as described in (Section III)  LIMIT OF INSURANCE; and

(b)  Our right and duty to defend end when we have used up our applicable limit of insurance in the payment of "damages".

We will pay, with respect to any claim or "suit" we defend, any "defense costs" we incur.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in ADDITIONAL POLICY BENEFITS.

b.  This insurance applies to "damages" because of "bodily injury" only if:

(1) The "bodily injury" is caused by "abusive conduct  that takes place in the "coverage territory";

(2) The "bodily injury" occurs during the policy

[*See* Exhibit 3 to Rosner Declaration, Dkt. #11-3 at p. 102.]

Each Rider defined all abuse as a single act of "abusive conduct," regardless of the number of acts or injured parties, and regardless of the period of time over which the abuse took place:

> 2.  "Abusive conduct" means each, every and all actual, threatened or alleged acts of physical abuse, sexual abuse,
> sexual molestation or sexual misconduct performed by one person or two or more people acting together. Each, every and all actual, threatened or alleged acts of physical abuse, sexual abuse, sexual molestation or sexual misconduct committed by,  participated in by, directed by, instigated by or knowingly allowed to happen by one or more  persons shall be considered to be one "abusive conduct" regardless of:
>
> > a.  The number of injured parties;
> >
> > b.  The period of time over which the acts of physical abuse, sexual abuse, sexual molestation or sexual misconduct took place; and
> >
> > c.  The number of such acts or encounters.
>
> "Abusive conduct" consisting of or comprising more than one act of physical abuse, sexual abuse, sexual molestation or sexual misconduct shall be deemed to take place, for all purposes within the scope of this policy, at the time of the first such act or encounter.

[*See* Exhibit 3 to Rosner Declaration, Dkt. #11-3 at p. 106.]

The Rider also expressly excluded coverage for molestation by an insured or an insured's family member which predated the policy period and continued into it:

> 2.  **Exclusions**
>
> This insurance does not apply to:

g.  To the molestation of any person by the named
    insured or family member of the named insured
    which predates the inception of this policy and
    continues into the policy period.

Each Rider similarly provided under its "Limits of Insurance" section that multiple

claims for damages because of multiple claims of abuse would be nevertheless considered a

single claim, and that that claim would be "assigned" to only one insurance policy:

**SECTION III - LIMIT OF INSURANCE**

1.  The limit of insurance shown in the Declarations and
    the rules below fix the most we will pay  "damages"
    regardless of the number of:

    a.  Insureds;

    b.  Claims made or "suits" brought; or

    c.  Persons or organizations making claims or
        bringing "suits".

2.  The limit of insurance shown in the Declarations for
    each "abusive conduct"  is the most we will pay for all
    "damages" incurred as the result of any claim of
    "abusive conduct".  Two or more claims for "damages'
    because of the same incident or interrelated incidents
    of "abusive conduct" shall be:

    a.  Considered a single claim.; and

    b.  Such claims, whenever made, shall be assigned
        to only one policy (whether issued by this or any
        another insurer) and if that is this policy, only one
        limit of insurance shall apply.

3.  The aggregate limit shown in the Declaration is,
    subject to paragraph 2.  of this Section, the total

limit of our liability for all "damages" to which this
insurance applies. The limits of this Coverage Part
apply separately to each consecutive
annuaperiod; and to any remaining period of less
than 12 months, starting with the beginning of the
policy period shown in the Declarations; unless
the policy period is extended after issuance for an
additional period of less than 12 months. In that
case, the additional period will be deemed part of
the last preceding period for purposes of
determining the limit of insurance.

[*See* Exhibit 3 to Rosner Declaration, Dkt. #11-3 at p. 103-4.]

Finally, each Rider included a series of "conditions," including an anti-stacking provision
that PIIC claims was designed to ensure that PIIC would pay the maximum limit of insurance
only once, even if there were overlapping coverages:

**8. Two Or More Coverage Parts Or Policies Issued By
Us**

It is our stated intention that the various coverage
parts or policy issued to you by us, or any company
affiliated with us, do not provide any duplication or
overlap of coverage for the same claim or "suit". We
have exercised diligence to draft our coverage parts
or policies to reflect this intention, but should the
circumstances of any claim or "suit" give rise to such
duplication or overlap of coverage then,
notwithstanding the other insurance provision, if this
policy and any other coverage part or  policy issued
to you by us, or any company affiliated with us, apply
to the same "abusive conduct" professional incident,
occurrence, offense, wrongful act, accident or loss,
the maximum limit of insurance under all such
coverage parts or policies combined shall not exceed
the highest applicable limit of insurance under any
one coverage part or policy.

This condition does not apply to any Excess or
Umbrella policy issued by us specifically to apply as
excess insurance over this policy.

[*See* Exhibit 3 to Rosner Declaration, Dkt. #11-3 at p. 105].

1

## II.    DISCUSSION

2

### A.    Summary Judgment Standard.

3

4    Summary judgment is appropriate when, viewing the facts in the light most favorable to

5    the nonmoving party, there is no genuine issue of material fact which would preclude summary

6    judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to

7    summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to

8    interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for

9    trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of

10    evidence in support of the non-moving party's position is not sufficient."  *Triton Energy Corp. v.*

11    *Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not

12    affect the outcome of the suit are irrelevant to the consideration of a motion for summary

13    judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words,

14    "summary judgment should be granted where the nonmoving party fails to offer evidence from

15    which a reasonable [fact finder] could return a [decision] in its favor."  *Triton Energy*, 68 F.3d at

16    1220.

17

### B.    Interpretation of Policy Language under Washington law.

18

19    The rules and principles governing the court's interpretation of the subject insurance

20    contract are well-settled in Washington State.  As with any contract, the court's primary goal is

21    to ascertain the parties' intent.  The interpretation of an insurance policy is a question of law, and

22    the policy is construed as a whole with the court giving force and effect to each clause in the

23    policy.  *Queen City Farms* v. *Central National Ins.  Co.*, 126 Wn.2d 50, 59-60, 882 P.2d 703

24    (1994); *see also American Star Ins. Co. v. Grice,* 121 Wn.2d 869, 874, 854 P.2d 622 (1993).

25    The language of an insurance policy is to be interpreted in accordance with the way it would be

26    understood by the average person, rather than in a technical sense.  *Id.*

27

28

If the language in an insurance contract is clear and unambiguous, the court must enforce it as written and may not modify the contract or create ambiguity where none exists.  However, if a policy provision on its face is fairly susceptible to two different but reasonable interpretations, the policy is ambiguous and the court must attempt to discern and enforce the contract as the parties intended.  To determine the parties' intent, the court first will view the contract as a whole, examining its subject matter and objective, the circumstances of its making, the subsequent conduct of the parties, and the reasonableness of their respective interpretations.  If the court determines that the policy remains ambiguous even after its consideration of any extrinsic evidence,[1] the court will apply a meaning and construction most favorable to the insured, even though the insurer may have intended another meaning.

The court must construe the insurance policy as a whole while giving each and every policy provision force, effect, and a fair, reasonable, and sensible construction.  Overall, the policy should be given a practical and reasonable interpretation rather than a strained or forced construction that leads to an absurd conclusion, or that renders the policy nonsensical or ineffective.  *Transcontinental Ins. Co. v. Washington Public Utilities Districts' Utility System,* 111 Wn.2d 452, 456-457, 760 P.2d 337 (1988) (internal citations omitted).

Furthermore, the rule strictly construing ambiguities in favor of the insured applies with added force to exclusionary clauses which seek to limit policy coverage.  Exclusions of coverage will not be extended beyond their "clear and unequivocal" meaning.  *Lynott v. National Union Fire Ins. Co.,* 123 Wn.2d 678, 690, 871 P.2d 146 (1994).  Indeed, where the policy language remains ambiguous even after consideration of extrinsic evidence, the legal effect of such ambiguity is to render the exclusionary language ineffective.  *Id.* (*Citing McDonald v. State Farm Fire & Cas. Co.,* 119 Wn.2d 724, 733, 837 P.2d 1000 (1992)).

---

[1] Relevant extrinsic evidence is often unavailable, as where the language at issue was not negotiated by the parties and is instead a part of a standard form policy.  *See Queen City Farms,* 126 Wn.2d at 60.

### C.   PIIC's Rider sought to impose a single aggregate limit of $1 million, regardless of the number of claims or policy periods.

PIIC's Motion is based on its claim that the policy language is unambiguous and its effect clear: multiple claims of abuse, in multiple policy periods, are deemed to be one act of abusive conduct and are therefore subject to the aggregate limit of $1 million.  The policy language upon which it relies is outlined above.

PIIC also relies on authority interpreting similar language and finding that the anti-stacking provisions were effective in cases with multiple incidents of abuse in multiple years. *See*, for example; *TIG Ins. Co. v. Smart Sch.*, 401 F. Supp. 2d 1334, 1343 (S.D. Fla. 2005) ("sexual abuse occurrence" defined such that "all acts of 'sexual abuse occurrence' " are to be deemed as a single occurrence that takes place when the first act of sexual abuse occurs," unambiguously "serves to collapse all sexual misconduct by a single perpetrator into a single occurrence"); *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 661 (Tex. App. 2005) ("Under the policy's unambiguous language, all of [a camp counselor's] alleged acts of sexual abuse, 'regardless of the number of persons involved, or the number of incidents or locations involved, or the period of time during which the acts of sexual molestation or abuse took place,' constitute a single Sexual Abuse Occurrence."); *and Certain Underwriters at Lloyd's London v. Valient Ins. Co.*, 155 Wn. App. 469, 473-74, 229 P.2d 930 (2010) ("The anti-stacking provision unambiguously makes a single policy limit available from affiliated companies for a single occurrence.").

OELC's opposition asks the Court (1) to avoid the question based on its allegations of bad faith, or (2) to interpret the policy so that the anti-stacking provisions do not apply.

1

2

           **1.**     **OELC's bad faith allegations have not mooted PIIC's claim for declaratory relief on policy interpretation.**

3

4

      OELC argues that PIIC's bad faith estops it from denying coverage, and moots the need for policy interpretation of the policy's limits.  It also claims that its (proposed) state law bad

5

faith claim[4] will moot PIIC's request for declaratory relief.

6

      PIIC correctly points out that it has not ever denied *coverage* for any of the underlying

7

abuse claims, and it did not defend the any of the claims under a reservation of rights.  Instead, it

8

simply asserts that the policies' aggregate limit of insurance is $1 million.  And while is true that

9

a successful bad faith claim may ultimately have the effect of removing the otherwise applicable

10

policy limits, no such determination has yet been made by this or any Court.  The Court will

11

proceed to the merits of the competing policy interpretations.

12

              **2.**     **The anti-stacking provisions relate to limits, not to coverage.**

13

14

      OELC argues that the Rider should read as a lay person would interpret it.  It claims that

15

the Rider's limit applies only to "bodily injury" that occurs during a given policy period:  [It]

16

applies to "damages" because of "bodily injury" only if the bodily injury is caused by abusive

17

conduct [and] occurs during the policy."  [*See* Exhibit 3 to Rosner Declaration, Dkt. #11-3 at p.

18

19

102.]  OELC argues that the Rider's plain language prohibits PIIC from assigning bodily injury

20

from abuse to a single policy, when the injury did not occur during that (earlier) policy period.

21

      PIIC responds that in multiple places the Rider clearly defines multiple acts of abuse as

22

one act of "abusive conduct," regardless of the number of actual acts or victims or the period in

23

which the acts took place.  The Rider's Limits section similarly and consistently provides that

24

25

multiple claims are to be considered a single claim, assigned to a single policy, and that only one

26

----

27

    [4] OELC has asserted PIIC's bad faith as an affirmative defense in this action, but has not asserted a counterclaim for bad faith in this case.  [Dkt. # 20].

28

limit of insurance applies to the claim. Finally, they emphasize, Condition 8 again provides that only a single policy limit applies, even where the coverage of multiple policies is triggered (by separate claims of abuse in multiple policy periods).

PIIC argues persuasively that OELC's position conflates the *trigger* of coverage (bodily injury during a given policy period) with the anti-stacking provision (which "deems" all such claims to have occurred in the first such policy so triggered, for purposes of determining the available limit of insurance). PIIC concedes that at least three of the Riders were triggered by claims of bodily injury caused by abusive conduct in those policy years. Indeed, it appears to concede that the abuse claims in multiple policy years were covered by the Rider in effect at the time each instance of abuse occurred. It argues, however, that the anti-stacking provisions come into play—that they *apply*—precisely because more than one policy was triggered.

These provisions deal with the limits available when covered claim(s) are made, not with whether a given claim is covered. Each Rider clearly provides that, where there are multiple claims of abuse over multiple policy periods, all those events are "deemed" to have taken place during the first triggered policy period. Each Rider provides that the most PIIC will pay as damages arising from multiple claims of abuse is [$1 Million]; that multiple claims for damages are, for limits purposes, considered a single claim, and shall be assigned to only a single policy. [*See* Dkt. #85 at fn. 10] This position is supported by the cases PIIC cites, and by a common sense reading of the language used in the Riders.

OELC similarly argues that Condition 8 should be read that the aggregate policy limit would apply (only if) the multiple claims of abuse occurred in the same policy period. It relies

on the expert opinion of Paul Dolbow[5] to suggest that such provisions typically apply to prevent two limits of insurance to apply to an occurrence that may be construed to have taken place in more than one policy period—in this case, for example, if the abuse occurred on the anniversary date (September 26) of the policy and therefore arguably to have occurred in both the expiring policy and the commencing policy.   OELC argues that coverage should only be excluded when the insurer can show that the loss is excluded by specific policy language.  But PIIC is not asserting a coverage exclusion; it is pointing out that the Riders' limit language deems each covered abuse to have occurred during a single policy period.

        In short, OELC's position ignores the clear policy language that all such claims are deemed to occur in the first policy period, for limits purposes, even if each claim triggers—is *covered by*—a separate Rider.

        The subject policy language is not ambiguous, and is not susceptible to more than one reasonable interpretation.  There are no questions of fact precluding a ruling that the policies mean what they say: the limit of insurance available for bodily injury arising from multiple claims of abuse over multiple policy periods is exactly and only $1 million[6].  PIIC's Motion for

---

    [5] PIIC's Motions to Strike the Dolbow [Dkt. #81] and LePlay [Dkt. #82] Declarations are DENIED.

    [6] OELC's final argument is that another employee, Eli Nelson, may have also abused some of the underlying Plaintiffs, and that as a result there should be at least $2 million in coverage available.  But as PIIC points out, there were no claims against Nelson, and the underlying plaintiffs' settlement with OELC specifically addresses OELC's liability for Tabor's abuse.

1    Summary Judgment is GRANTED.

2         IT IS SO ORDERED.

3         Dated this 16th day of October, 2013.

4

5

6         RONALD B. LEIGHTON
          UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28